# Judge Hellerstein



James H. Hohenstein
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200
Telefax: (212) 385-9010
E-mail: jim.hohenstein@hklaw.com
        lissa.schaupp@hklaw.com

Attorneys for Plaintiff,
*FR8 Singapore Pte Limited*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



FR8 SINGAPORE PTE LIMITED,

        Plaintiff,

      -against-

RITONA OIL LTD. and LBK SHIPPING LTD.,

        Defendants.

08 Civ.    (   )

**VERIFIED
COMPLAINT**

      Plaintiff, FR8 Singapore Pte Limited ("FR8") by and through its attorneys, Holland & Knight LLP, for its verified amended complaint against defendants, Ritona Oil Ltd. ("Ritona"), and LBK Shipping Ltd. ("LBK") alleges, upon information and belief, as follows:

      1.    This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.      At all times material herein, plaintiff FR8 was and is a business entity organized and existing under the laws of the Singapore and maintains a place of business at No. 2 Battery Road, #22-01, Maybank Tower, Singapore 049907.

3.      Upon information and belief, at all times material herein, defendant Ritona was and is a foreign entity organized and existing under the laws of a foreign nation with a principal place of business at Palm Grove House, P.O. Box 438, Road Town, Tortola, British Virgin Islands.

4.      Upon information and belief, at all times material herein, defendant LBK was and is a foreign entity organized and existing under the laws of a foreign nation with a principal place of business at Akara Bldg., 24 De Castro Street, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands, and was, and still is, a paying/receiving agent of Ritona.

5.      On or about August 8, 2007, Ritona[1] as disponent owner of the M/T MARE PACIFIC ("Vessel") and FR8 as charterer entered into a time charter party ("Time Charter"), which was memorialized via a clean fixture recap ("Fixture Recap").  A true and correct copy of the Fixture Recap is attached hereto as Exhibit 1.

6.      The Time Charter was based on a SHELLTIME 4 form charter party with logical amendments.  A true and correct copy of the SHELLTIME 4 form is attached hereto as Exhibit 2.

---

[1] A disponent owner is the person or company who controls the commercial operation of a vessel and is responsible for deciding ports of call and the cargoes to be carried.  Very often, the disponent owner is not the registered owner having title to the vessel but a party who has previously chartered the vessel from the registered owner or another charterer.  Peter Brodie, DICTIONARY OF SHIPPING (4th ed. 2003).

7.    Clause 1 contained in the additional clauses in the Fixture Recap comprising the Time Charter states that:

> Owners undertake to maintain minimum 4 major oil company approvals and a sire report[2] less than 6 months old during all time charter period failing which Charterers shall have the option to cancelled [sic] the balance of the charter without recourse to either party.

8.    In late March and early April of 2008 the Vessel lost some of its major oil company approvals, and thus dropped below the minimum of four major oil company approvals required by the Time Charter.

9.    As a result of Ritona' failure to maintain the requisite four major oil company approvals, FR8 cancelled the Time Charter in accordance with the terms of additional Clause 1, and redelivered the Vessel to Ritona on or about April 17, 2008.

10.    Because the Vessel was redelivered with a large amount of bunkers on board and FR8 had paid for hire in advance, the final hire statement dated April 23, 2008 that was issued by LBK on Ritona's behalf for FR8's charter of the Vessel showed a balance in favor of FR8 in the amount of US$1,003,815.28 ("Final Hire Statement"). A true and correct copy of the Final Hire Statement is attached hereto as Exhibit 3.

11.    There is no dispute between the parties that money is owed FR8, and there is no dispute about the amount owed. In an e-mail dated April 29, 2008 from LBK acting on behalf of Ritona to FR8, LBK acknowledged the debt owed to FR8 and requested that FR8 confirm the amount due to FR8. Specifically the April 29, 2008 e-mail from LBK stated:

> Please confirm that CHRTRS [FR8] accept our final hire invoice amounting to USD 1.003.815.28. It is definitive and to the further discussion is not subject.

---

[2] "SIRE" stands for "Ship Inspection Report Program." SIRE is a tanker risk assessment and reporting program administered by the Oil Companies International Marine Forum. *See* http://www.ocimf.com/pages.cfm?action=sire_introduction2.

In response to LBK's e-mail quoted above, FR8 confirmed acceptance of the final hire invoice amount due in the amount of $1,003,815.28. A true and correct copy of the e-mail chain containing the above referenced correspondence is attached hereto as Exhibit 4.

12.    Despite the parties' agreement that Ritona owes FR8 $1,003,815.28 under the terms of the Time Charter, Ritona has failed to pay FR8 this amount in breach of the parties' agreement.

13.    The terms of the Time Charter call for the application of English law and London arbitration. While all disputes arising out of the Time Charter are to be arbitrated in London, the action herein is submitted in accordance with Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure as well as 9 U.S.C. §8, and is not and cannot be considered a waiver of the Time Charter's arbitration clause.

14.    Interest, costs and attorneys' fees routinely are awarded to the prevailing party in London arbitration proceedings.

15.    Upon information and belief, it would take approximately one year to arbitrate this dispute to conclusion, resulting in the following estimated interest and attorneys' fees and costs:

| | |
|---|---|
| Interest (from April 23, 2008 though May 21, 2009 at 5%): | $    54,041.01 |
| Attorneys' fees: | $  100,000.00 |
| Costs: | $    30,000.00 |
| Total Principal Claim: | $1,003,815.28 |
| Total Sought: | **$1,187,856.29** |

### FR8's Alter Ego Allegations Against Defendants

16.     Upon information and belief, LBK is the alter-ego of Ritona because it dominates and disregards Ritona's corporate form to the extent that LBK is actually carrying on Ritona's business and operations as if the same were its own and vice versa.

17.     As stated above in paragraph 11, LBK rather than Ritona issued the Final Hire Statement for the Time Charter.  The Final Hire Statement was on LBK's letterhead simply noting at the bottom of the invoice that it was issued on behalf of Ritona.  (Exhibit 3).

18.     LBK corresponded with FR8 in order to negotiate and agree upon the final amount of monies due to FR8 under the Time Charter.  (Exhibit 4).  LBK also stated in one of its e-mails to FR8 that FR8's "request to remit usd $1,003,815.28 will be settled only after [FR8's] confirmation and approval of our last invoice."  (*Id.*) (emphasis added).  This is evidence that for the purposes of contracting with FR8, Ritona and LBK were one and the same entity.  LBK was carrying on the business and operations of Ritona and was intimately involved in arranging the details for and settling a debt owed to FR8 from Ritona under the Time Charter.

19.     Upon information and belief, Ritona uses LBK as an agent for payment or "pass through entity" by which LBK makes payment on behalf of Ritona without LBK having received any consideration or benefit.  Alternatively, Ritona and LBK have commingled funds and/or otherwise are failing to observe corporate formalities by allowing LBK to arrange and pay for debts owed on behalf of Ritona rather than LBK.

20.     Ritona and LBK also have a shared interest in the vessels comprising Ritona's fleet.  All eleven (11) vessels comprising Ritona's fleet, including the M/T MARE PACIFIC (the vessel subject to the Time Charter) as indicated on Ritona's website, *see* http://www.ritonaoil.com/fleet.html, also are included in LBK's fleet of eighteen (18) vessels as

indicated on LBK's website. *See* http://www.lbkshipping.com/5.htm.  A true and correct copy of print-outs of the fleets of Ritona and LBK as listed on their respective websites is attached hereto as Exhibit 5.

21.    Because of the actions of the Defendants recited above, in addition to other actions yet to be discovered, Defendants are liable to FR8 either (i) as alter-egos and/or corporate arms of the same company, or (ii) on grounds that LBK's actions carrying out the business and operations of Ritona, in particular acknowledging, confirming, and promising payment (upon FR8's confirmation of the amount due) for Ritona's debts with third parties, require this Court to disregard the Defendants' corporate veils and treat Defendants as a single entity.

22.    Ritona and LBK are not found within the Southern District of New York but they do have assets, good or chattels within the jurisdiction, to wit: funds or accounts held in the name(s) of Ritona Oil Ltd. and/or LBK Shipping Ltd. with, upon information and belief, the following financial institutions:  ABN Amro Bank; American Express Bank; Banco Popular; Bank of America, N.A.; Bank of China; Bank Leumi USA; The Bank of New York; Bank of Tokyo-Mitsubishi UFJ Ltd.; BNP Paribas; Calyon Investment Bank; Citibank, N.A.; Commerzbank; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; Standard Chartered Bank; Société Générale; UBS AG; Wachovia Bank, N.A.; or any other financial institution within the Southern District of New York.

**WHEREFORE**, Plaintiff demands judgment as follows:

1.    That process in due form of law according to the practice of this Court in the form of a writ of maritime attachment be issued against bank accounts and other property of Ritona Oil Ltd. and LBK Shipping Ltd. with the financial institutions noted above in paragraph 22;

2.      That Ritona Oil Ltd. and LBK Shipping Ltd. and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3.      That this court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court.

4.      That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof.

5.      That this Court award FR8 its attorney's fees and costs of this action; and,

6.      That this Court grant FR8 such other and further relief which it may deem just and proper.

Dated: New York, New York
       May 21, 2008

HOLLAND & KNIGHT LLP

By: _____

James H. Hohenstein
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY  10007-3189
(212) 513-3200
Telefax:  (212) 385-9010
E-mail:  jim.hohenstein@hklaw.com
         lissa.schaupp@hklaw.com

Attorneys for Plaintiff,
*FR8 Singapore Pte Limited*

## VERIFICATION

STATE OF NEW YORK          )

                                         :ss.:

COUNTY OF NEW YORK    )

JAMES H. HOHENSTEIN, being duly sworn, deposes and says:

I am a member of the firm of Holland & Knight LLP, counsel for FR8 Singapore Pte Limited ("Plaintiff"), plaintiff in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Plaintiff and corresponded with Plaintiff's representatives regarding this matter. I am authorized by Plaintiff to make this verification, and the reason for my making it as opposed to an officer or director of Plaintiff is that there are none within the jurisdiction of this Honorable Court.

_____
James H. Hohenstein

Sworn to before me this
21st day of May, 2008

_____
Notary Public

DIALYZ E. MORALES
Notary Public, State of New York
NO. 01MO6059215
Qualified in New York County
Commission Expires June 25, 20__11

# 5349848_v1

8

# EXHIBIT 1

From: Roger Woods
Sent: 15 October 2007 18:40
To:    Malcolm Francis
Cc:    Chris Green; opsmaybank
Subject:    FW: MT MARE PACIFIC / FR8 SINGAPORE PTE LTD TCP 08-8-2007


-----Original Message-----
From: Chris Green
Sent: 13 August 2007 11:28
To: FR8 Trading
Cc: Daryll O'Dwyer - Singapore; Michael Kennefick
Subject: FW: MT MARE PACIFIC / FR8 SINGAPORE PTE LTD TCP 08-8-2007

Chaps,please find below mare pacific re cap for a new 1 year deal.
The mare atlantic option was finally cancelled and vessel id=s due for
redelivery today.
Many thks

-----Original Message-----
From: LBK Shipping [mailto:lbkshipp@sp.ru]
Sent: 13 August 2007 09:20
To: Chris Green
Cc: ritonaoil
Subject: MT MARE PACIFIC / FR8 SINGAPORE PTE LTD TCP 08-8-2007

TO  : FR8 SINGAPORE PTE LTD
ATTN: CHRIS GREEN  PLEASE

TO  : RITONA OIL LTD
ATTN: SERGEY DOZHDEV PLEASE

FROM: LBK SHIPPING LTD

DATE: 08-8-2007

RE  : MT MARE PACIFIC / FR8 SINGAPORE PTE LTD TCP 08-8-2007

GOOD DAY,

S T R I C T L Y  P R I V A T E  A N D  C O N F I D E N T I A L

PLEASED TO RECAP HEREBELOW, AS PER YOUR AUTHORITY, FOLLOWING FIXTURE WITH
ALL
SUBJECTS LIFTED WITHIN THE AGREED TIME LIMIT AND CHARTER PARTY DATED
08 AUGUST 2007.

KINDLY ASK YOU TO RECONFIRM THE BELOW RECAP BEING IN ORDER WITH PREVIOUSLY
HELD NEGOTIATIONS.

CHARTERERS:
FR8 SINGAPORE PTE LTD

DISPONENT OWNER:
RITONA OIL,
PALM GROVE  HOUSE ,
P.O. BOX 438,ROAD  TOWN,
TORTOLA,VIRGIN  ISLANDS (BRITISH)

VESSEL : MARE PACIFIC
EX-NAME: ZEMGALE / MAYA

DWT: 68,467 MT
DRAUGHT: 13.21M
LOA: 228,54 M
BEAM: 32.20 M
BUILT: 2001
FLAG:  AS PER Q88
CAPACITY AT 98 PCT EXCL SLOPS : 77,883 CUM SLOP TANK 1: 1171.50 CBM SLOP TANK
2:  996.40 CBM TOTAL SLOPS: 2167.90 CBM
SBT: YES
COW: YES
IGS: YES
DOUBLE HULL: YES
TPC: 66,43
BCM: 115,5M
KTM: 47,03M
COATINGS: YES EPOXY
COILS: YES
CLASS: L.R.S.
DERRICKS: 1 X 15 MT CRANE
SCNT: 37,083
PCRT: 32,321

OTHERWISE DESCRIBED AS PER SUPPLIED Q88/OCIMF

TO THE BEST OF OWNERS KNOWLEDGE AT THE MOMENT OF FIXING THE VESSEL IS NOT
REJECTED BY :

- SHELL
- BP
- STATOIL
- CHEVTEX

PLSE NOTE DUE TO CHANGE OF VETTING PROCEDURE THE MAJORS WILL NOT GIVE AN
OUTRIGHT APPROVAL, BUT SCREEN THE VESSEL ON A CASE BY CASE BASIS.

ACCORDINGLY THE ABOVE OIL MAJOR APPROVALS ARE GIVEN AS AN ADVICE TO THE BEST
OF OWNERS KNOWLEDGE ONLY AND SUBJECT TO SCREENING BY THE INDIVIDUAL OIL
COMPANIES.

LAST SIRE INSPECTION: please advise

NEXT SPECIAL SURVEY: 17-01-2009


SPEED/CONSUMPTIONS UPTO AND INCL BFORT 5

LADEN:

-13.5 KNOTS ON 35.0 M/T HFO MAXIMUM 380 CST DAILY,  PLUS 2.5 M/T HFO MAXIMUM
380 CST FOR AE; -13,0 KNOTS ON 32.0 M/T HFO MAXIMUM 380 CST DAILY  PLUS 2.5
M/T HFO MAXIMUM 380 CST FOR AE;

BALLAST:

-14,0 KNOTS ON 33.0 M/T HFO MAXIMUM 380 CST DAILY,  PLUS 2.5 M/T HFO MAXIMUM
380 CSTFOR AE; -13,0 KNOTS ON 30.0 M/T HFO MAXIMUM 380 CST DAILY,  PLUS 2.5
M/T HFO MAXIMUM 380 CST FOR AE;

OWNERS WARRANT THE VESSEL'S FUEL OIL / DIESEL OIL DAILY TOTAL CONSUMPTION IN METRIC TONS IN THE FOLLOWING CASES:

A) IDLE WITH BOILERS OFF:   2 M/T HFO PLUS 2.0 MT MDO
B) IDLE WITH BOILERS STANDBY: 5 M/T HFO MAXIMUM 380 CST
C) LOADING FULL CARGO WITHIN 24 HOURS: 6 M/T HFO MAXIMUM 380 CST
D) DISCHARGING FULL CARGO WITHIN 24 HOURS (INCLUDING INERTING TANKS):
   60 M/T HFO MAXIMUM 380 CST,
E) MAINTAINING CARGO TEMPERATURE AT 135 DEG.F.:
   20 M/T HFO MAXIMUM 380 CST
F) EXTRA CONSUMPTION AND TIME FOR RE-INERTING ALL CARGO TANKS FROM
   A GAS-FREE CONDITION: 36 M/T HFO MAXIMUM 380 CST / 48 HOURS
G) VESSEL WILL CONSUME 1.2 TONS MDO PER DAY WHILE
   MANOUVERING / NAVIGATING IN PORTS / RIVERS / CANALS /
   SHALLOW WATERS
H) BALLAST PUMP WORK 1.5 MT MDO PER DAY
I) TANKS WASHING 30 MT IFO RER DAY.
N) FOR INCINERATOR - 0,3 MDO/ 24 HRS

BUNKER'S TYPE (MAXIMUM CST): VESSEL TO BE SUPPLIED WITH BUNKERS NOT INFERIOR TO:
MDO-GRADE DMB IN ACCORDANCE WITH ISO 8217 (DIS) 1996; HFO-GRADE RMG35 IN ACCORDANCE WITH ISO 8217 (DIS) 1996

NO OVERPERFORMANCE CLAIMS TO BE MADE UNDER THIS CHARTERPARTY.

CHRTRS AGREE TO USE LOW SULPHUR FUEL OIL IN SPECIAL LOW EMISSION ZONES.

=================================================================
FOR TIME CHARTER

PERIOD : 12 MONTHS +/- 45 DAYS IN CHARTERERS OPTION.

DELIVERY : SAME PORT AS SHIP IS REDELIVERED PREVIOUS CHARTER PARTY

REDELIVERY: DLOSP WORLDWIDE IN CHARTERERS OPTION
        EXCLUDING AUSTRALIA AND NEW ZEALAND

LAYCAN : IN DIRECT CONTINUATION UPON REDELIVERY
        PREVIOUS CHARTER PARTY

HIRE    : USD 27.100 PDPR INCLUDING CREW OVERTIME AND
        COMMUNICATIONS PAYABLE EVERY 30 DAYS BASIS

COMMISSIONS PAYABLE BY OWNERS : 1.25PCT FR8 SERVICES PTE LTD.
(TO BE DEDUCTED AT SOURCE) AND 1.25PCT LBK SHIPPING LTD ON HIRE
=================================================================

TRADING LIMITS: WORLDWIDE EXCLUDING IRAQ, ISRAEL, ALBANIA, CUBA,,TOC,NORTH KOREA, ABHAZIA AND COUNTRIES TO WHICH THE VSL MAY NOT TRADE BY VIRTUE OF THE REGISTRATION OF THE VSL AND/OR THE NATIONALITY OF HER OWNERS AND/OR MANAGERS,
ALSO UN SANCTIONED COUNTRIES WAR OR WARLIKE AREAS/ZONES.

TRADING AREA TO BE ALWAYS WIWL, IN CASE CHRTRS WISH TO BREACH IWL THEY HAVE TO
APPLY FOR OWNERS SPECIAL PERMISSION WHICH SHOULD NOT BE UNREASONABLY WITHHELD
(SEE ALSO CL.5 OF ADDITIONAL TERMS). VESSEL NOT TO TRADE IN ICE NOR TO FOLLOW

ICEBREAKERS.

CARGOES    : CRUDE OIL, CONDENSATE, DPP INCLUDING CARBON BLACK
FEEDSTOCK AND ORIMULSION (SUBJECT TO ACCEPTANCE BY CLASS), CPP AND ALL OTHER
CARGOES IN ACCORDANCE WITH VSL'S INTERNATIONAL POLLUTION PREVENTION
CERTIFICATE FOR CARRIAGE OF NOXIOUS LIQUID SUBSTANCES IN BULK, CLASS,
CERTIFICATE OF FITNESS, TANKS, LINES AND VSL'S PUMPING CAPABILITY, MAXIMUM
LOADING TEMPERATURE OF 165 DEG FAH AND VSL TO MAINTAIN MAX HEATING OF
135 DEG FAX. MAXIMUM 3 DIFFERENT GRADES WITHIN VSL'S NATURAL SEGREGATION.

- SHELLTIME 4 (DECEMBER 1984) TIME CHARTER PARTY WITH THE FOLLOWING
AMENDMENTS:

CLS 2B(II) INSERT AFTER "AND" 'INCLUDING THE CONNECTION AND DISCONNECTING OF
CARGO/BALLAST HOSES IF REQUIRED.'

CLS 6 LINE 89: INSERT AFTER "WATER" "EXCEPT FRESH WATER USED FOR CLEANING
OF TANKS"

CLS 7 LINE 97: DELETE "EXCEPT FUEL USED FOR DOMESTIC SERVICES"

CLS 9 LINE 109: INSERT AFTER "IN" "US DOLLARS"

CLS 10 LINE 132: INSERT AFTER "EXCEED" "300 METRIC TONS"

CLS 11 - DELETE

CLS 13 B) - DELETE

CLS 15 - DELETE AND INSERT
      NO PAYMENT FOR BUNKERS ON DELIVERY. DIFFERENCE IN VALUE OF BUNKERS ON
      DELIVERY/REDELIVERY SHALL BE COMPENSATED IN ACCORDANCE WITH PRICES
      ESTABLISHED IN ACCORDANCE WITH PRINTED CLS. 15 OF THIS C/P.

CLS 17 - AFTER "ACCOMODATION" INSERT MAX 2 PERSONS LINE 182 INSERT
      "USD 20 PAYABLE TOGETHER WITH HIRE"

CLS 21 E) DELETE AND INSERT 'OFF HIRE DURING ANY PERIOD TO BE ADDED
      AT CHARTERERS OPTION AND TO BE DECLARED NOT LATER THAN 10 DAYS PRIOR
TO
      THE TIME OF REDELIVERY'

CLS 22 LINE 259 INSERT '30 DAYS'

CLS 24 LINE 303 INSERT "SEE MAIN DESCRIPTION"
      LINE 326 DELETE '8' INSERT '5'
      LINE 328 DELETE 'OR EXCEEDS' AND 'OR EXCESS'
      LINE 330 DELETE 'OR AN INCREASE'
      LINE 333 DELETE 'OR A DECREASE'
      LINE 335 DELETE 'OR THE BUNKER SAVED, AS THE CASE MAY BE'
      LINE 336 DELETE 'OR ADDED TO'
      LINE 337 DELETE 'ADDITION TO OR'
      LINE 339 DELETE 'ADDITION OR'
      LINE 341 DELETE 'ADDITION TO OR'
      LINE 351-352 DELETE IN FULL

CLS 27 IT IS AGREED UNDER THIS CLAUSE THAT HAMBURG RULES TO APPLY
      WHEN HAMBURG RULES ARE COMPULSORY (SUBJECT TO ACCEPTANCE BY OWNERS)

CLS 31 - DELETE IN FULL

CLS 33 LINE 409 DELETE 'USSR' INSERT 'RUSSIA'

CLS 37 LINE 462 DELETE '1974' INSERT '1994'

CLS 38 IT IS AGREED UNDER THIS CLAUSE THAT HAMBURG RULES TO APPLY
     WHEN HAMBURG RULES ARE COMPULSORY (SUBJECT TO ACCEPTANCE BY OWNERS)

CLS 39 DELETE

CLS 41 DELETE AND INSERT:

"THIS CONTRACT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH
LAW AND ANY DISPUTE ARISING OUT OF OR IN CONNECTION WITH THIS CONTRACT SHALL
BE REFERRED TO ARBITRATION IN LONDON UNDER THE LMAA TERMS CURRENT AT THE TIME
WHEN THE ARBITRATION PROCEEDINGS ARE COMMENCED.

EACH PARTY SHALL APPOINT ONE ARBITRATOR.

A PARTY WISHING TO REFER A DISPUTE TO ARBITRATION SHALL APPOINT ITS ARBITRATOR
AND SEND NOTICE OF SUCH APPOINTMENT IN WRITING TO THE OTHER PARTY REQUIRING
THE OTHER PARTY TO APPOINT ITS OWN ARBITRATOR WITHIN
14 CALENDAR DAYS OF THAT NOTICE AND STATING THAT IT WILL APPOINT ITS
ARBITRATOR AS SOLE ARBITRATOR UNLESS THE OTHER PARTY APPOINTS ITS OWN
ARBITRATOR AND GIVE NOTICE THAT IT HAS DONE SO WITHIN THE 14 DAYS SPECIFIED.

IF THE TWO ARBITRATORS PROPERLY APPOINTED BY THE PARTIES SHALL NOT AGREE THEY
SHALL APPOINT AN UMPIRE WHOSE DECISION SHALL BE FINAL. THE AWARD OF THE
ARBITRATORS OR THE UMPIRE SHALL BE FINAL AND BINDING UPON BOTH PARTIES.

IF THE OTHER PARTY DOES NOT APPOINT ITS OWN ARBITRATOR AND GIVE NOTICE THAT IT
HAS DONE SO WITHIN THE 14 DAYS SPECIFIED, THE PARTY REFERRING A DISPUTE TO
ARBITRATION MAY, WITHOUT THE REQUIREMENT OF ANY FURTHER PRIOR NOTICE TO THE
OTHER PARTY, APPOINT ITS ARBITRATOR AS SOLE ARBITRATOR AND SHALL ADVISE THE
OTHER PARTY ACCORDINGLY. THE AWARD OF A SOLE ARBITRATOR SHALL BE BINDING ON
BOTH PARTIES AS IF HE HAD BEEN APPOINTED BY AGREEMENT."

ADDITIONAL CLAUSES:

1) MAJOR OIL COMPANY CLS.
OWNERS UNDERTAKE TO MAINTAIN MINIMUM 4 MAJOR OIL COMPANIES APPROVALS and a
SIRE report less than 6 months old DURING ALL TIME CHARTER PERIOD failing
which Charterers shall have the option to cancelled the balance of the Charter
without recourse to either party.

2) BILL OF LADING/LOI CLS
 OWNERS AGREE TO RELEASE CARGO AT DISCHARGING PORT WITHOUT PRODUCTION OF BILLS
OF LADING OR CHANGE OF DESTINATION AGAINST CHARTERERS LETTER OF INDEMNITY
WHICH WORDING SHALL BE IN ACCORDANCE WITH OWNERS PANDI CLUB (STANDARD FORM)
WITHOUT BANK GUARANTEE. THE LETTER OF INDEMNITY IS ATTACHED TO THIS
CHARTERPARTY AND CAN BE INVOKED BY THE CHARTERERS AT ANY TIME. OWNERS
FURTHERMORE AGREE WHENEVER NECESSARY TO ACCEPT SUB-CHARTERERS LETTER OF
INDEMNITY. ANY LETTER OF INDEMNITY SHALL AUTOMATICALLY BECOME NULL AND VOID

AGAINST PRESENTATION OF ONE OUT OF THREE ORIGINAL BILLS OF LADING OR AFTER 13
MONTHS AFTER COMPLETION OF FINAL DISCHARGE, PROVIDED THAT NO LEGAL
PROCEEDINGS
HAVE BEEN INSTITUTED EARLIER.

OWNERS TO ADVISE CHARTERERS IMMEDIATELY IN WRITING IF ANY PROCEEDINGS ARE
INSTITUTED.

3) ITF CLS

OWNERS WARRANT THAT THE VSL HAS ON BOARD AN ITF CERTIFICATE OR EQUIVALENT
ALLOWING THE VSL'S CALL AND OPERATIONS IN ALL PORTS WITHIN THE C/P TRADING
RANGE/AREA AND WILL REMAIN IN COMPLIANCE WITH THE ABOVE DURING THE CURRENCY
OF
THIS CHARTER ANY TIME.

4) DISCHARGE PERFORMANCE CLS
 OWNERS WARRANT VESSEL ABLE DISCHARGE ENTIRE CARGO WITHIN 24 HOURS OR
MAINTAIN
100 PSI AT SHIP'S RAILS PROVIDED SHORE FACILITIES PERMIT AND VSL IS ALLOWED TO
USE FULL PUMPING CAPACITY, PROVIDED CARGO HAS SUCH VISCOSITY THAT IT GIVES
FREE FLOAT TO VSL'S PUMPS AS VERIFIED BY TWO INDEPENDENT SURVEYORS ONE
NOMINATED AND PAID BY OWNERS AND ANOTHER BY CHRTRS. SUCH PUMPING WARRANTY
ALWAYS TO EXCLUDE STRIPPING.

5) IWL CLS
ANY EXTRA INSURANCE AND/OR CHARGES INCURRED BY BREACHING IWL TO BE FOR
CHRTRS
ACCT.

6) WARRANTY
OWNERS GUARANTEE THAT THE VESSEL IS NOT PRECLUDED FROM DUE AND NORMAL
PERFORMANCE UNDER THIS CHARTER PARTY BY VIRTUE OF PREVIOUS TRADING.

7) ELIGIBILITY AND COMPLIANCE CLAUSE
OWNERS WARRANT THAT THE VESSEL IS IN ALL RESPECTS ELIGIBLE UNDER APPLICABLE
CONVENTIONS, LAWS AND REGULATIONS FOR TRADING TO THE PORTS AND PLACES
SPECIFIED IN THIS CP AND SHALL HAVE ON BOARD FOR INSPECTION BY THE APPROPRIATE
AUTHORITIES ALL CERTIFICATES, RECORDS, COMPLIANCE LETTERS, CONTINGENCY PLANS
AND OTHER DOCUMENTS REQUIRED FOR SUCH SERVICES, INCLUDING, BUT NOT LIMITED
TO
CERTIFICATES OF FINANCIAL RESPONSIBILITY FOR OIL POLLUTION.

OWNER FURTHER WARRANTS THAT THE VESSEL DOES, AND WILL, FULLY COMPLY WITH
ALL
APPLICABLE CONVENTIONS, LAWS, REGULATIONS AND ORDINANCES OF ANY
INTERNATIONAL,
NATIONAL STATE OR LOCAL GOVERNMENTAL ENTITY HAVING JURISDICTION. ANY
DELAYS,LOSSES, EXPENSES OR DAMAGES ARISING AS A RESULT OF FAILURE TO COMPLY
WITH THIS CLAUSE SHALL BE FOR OWNER'S ACCOUNT.

IN THE INTEREST OF SAFETY, OWNERS WILL RECOMMEND THAT THE MASTER OBSERVE
THE
RECOMMENDATIONS AS TO TRAFFIC SEPARATION AND ROUTING WHICH ARE ISSUED
FROM
TIME TO TIME BY THE INTERNATIONAL MARITIME ORGANISATION (IMO) OR AS
PROMULGATED BY THE STATE OF THE FLAG OF THE VESSEL OR THE STATE IN WHICH THE
EFFECTIVE MANAGEMENT OF THE VESSEL IS EXERCISED.

8) CLOSED LOADING SYSTEM CLS
 OWNERS WARRANT THAT VESSEL IS EQUIPPED WITH A WORKING CLOSED LOADING
SYSTEM
AND WILL SO REMAIN THROUGHOUT THE TIMECHARTER PERIOD.

9) OCIMF CLS
OWNER WARRANT THE VESSEL IS EQUIPPED TO OIL COMPANY INTERNATIONAL MARINE
FORUM
STANDARDS RELATING TO : - STANDARDS FOR OILTANKER MANIFOLD AND ASSOCIATED
EQUIPMENT LATEST EDITION  - SHIP TO SHIP TRANSFER PETROLEUM GUIDE LATEST
EDITION AND ANY AMENDMENTS THERETO

10) PANDI POLLUTION CLS
OWNERS WARRANT THAT THEY WILL HAVE IN PLACE INSURANCE COVERAGE FOR OIL
POLLUTION FOR THE MAX LIMITS (PRESENTLY USD 1.0 BILLION) ON OFFER THROUGH THE
INTERNATIONAL GROUP OF PANDI CLUBS AND THAT COVER WILL REMAIN IN PLACE
THROUGHOUT THE PERIOD OF THIS CHARTER.

11) BIMCO ITOPF CLAUSE
BIMCO ITOPF CLAUSE TO BE INCORPORATED IN THIS C/P

12) HEATING CLS
OWNERS WARRANT VESSEL IS EQUIPPED WITH STAINLESS STEEL HEATING COILS IN GOOD
WORKING ORDER AND CAPABLE OF HEATING AND MAINTAINING CARGO LOADED TEMP
UPTO
MAX 135 DEG F MAX LOADING TEMP 165 DEG F.

13) CIVIL LIABILITY CONVENTION CLS
 OWNERS WARRANT VESSEL CARRY ONBOARD A ORIGINAL VALID CLC CERTIFICATE
THROUGHOUT THE TIME CHARTER PARTY PERIOD.

14) DETENTION CLS
 SHOULD THE VESSEL BE SEIZED OR DETAINED BY ANY AUTHORITY, OR ARRESTED AT THE
SUIT OF ANY PART HAVING OR PURPORTING TO HAVE A CLAIM AGAINST ANY INTEREST IN
THE VESSEL BORNE BY THE ORIGINAL OWNERS, HIRE SHALL NOT BE PAYABLE IN RESPECT
OF ANY PERIOD DURING WHICH THE VESSEL IS NOT AT CHARTERERS USE AND ALL EXTRA
EXPENSES SHALL BE FOR OWNERS' ACCOUNT.

15) SMUGGLING CLS
 ANY DELAY, EXPENSES AND/OR FINES INCURRED ON THE ACCOUNT OF SMUGGLING TO
BE
FOR OWNER'S ACCOUNT IF CAUSED BY MASTER, OFFICERS, CREW OR OWNERS'
SERVANTS.

16) CARGO RETENTION CLS
 IN THE EVENT THAT ANY CARGO REMAINS ONBOARD UPON COMPLETION OF DISCHARGE,
CHARTERERS SHALL HAVE THE RIGHT TO CLAIM FROM HIRE AN AMOUNT EQUAL TO THE
FOB
PORT OF LOADING VALUE OF SUCH CARGO PLUS FREIGHT DUE WITH RESPECT THERETO,
PROVIDED THAT THE VOLUME OF CARGO REMAINING ONBOARD IS LIQUID AND PUMPABLE
AND
REACHABLE BY VESSEL EQUIPMENT AS DETERMINED BY INDEPENDENT INSPECTOR.

17) IN-TRANSIT LOSS CLS
 IN ADDITION TO ANY OTHER RIGHTS WHICH CHARTERERS MAY HAVE, OWNERS WILL BE
RESPONSIBLE FOR THE FULL AMOUNT OF ANY IN-TRANSIT LOSS IF IN-TRANSIT LOSS
EXCEEDS 0.5 PERCENT AND CHARTERERS SHALL HAVE THE RIGHT TO CLAIM FROM HIRE
AN
AMOUNT EQUAL TO THE FOB PORT OF LOADING VALUE OF SUCH LOST CARGO PLUS
FREIGHT

AND INSURANCE DUE WITH RESPECT THERETO. IN-TRANSIT LOSS IS DEFINED AS THE
DIFFERENCE BETWEEN NET VESSEL VOLUMES AFTER LOADING AT THE LOADING PORT
AND
BEFORE UNLOADING AT THE DISCHARGING PORT.

18) OFF-HIRE CONSUMPTION CLAUSE
IN THE EVENT OF ANY OFF-HIRES ARISING FROM ANY MATTER ALL BUNKERS USED BY THE
VESSEL DURING SUCH PERIODS SHALL BE FOR OWNERS ACCOUNT.

19) SUPERCARGO SURVEYOR CLAUSE
  CHARTERERS SHALL HAVE THE RIGHT TO PLACE ONBOARD, AT THEIR COST AND RISK, A
SUPERCARGO TO SURVEY CLEANING AND/OR LOAD/DISCHARGE OPERATIONS.

20) TANK CLEANING CLS.
OWNERS TO BE FULLY RESPONSIBLE FOR ANY TANK CLEANING MAKING USE OF VESSEL'S
CREW AND EQUIPMENT IN ACCORDANCE WITH CHARTERERS CLEANING INSTRUCTIONS.

ANY CHEMICALS USED TO BE FOR CHARTERERS ACCOUNT. HOWEVER TIME, BUNKERS
AND
CONSUMPTION OF CLEANING CHEMICALS NOT TO EXCEED INDUSTRY STANDARDS.

21) ISM CLAUSE.
FROM DATE OF COMING INTO FORCE OF INTERNATIONAL SAFETY MANAGEMENT
(ISM)CODE IN
RELATION TO THE VESSEL AND THEREAFTER DURING THE CURRENCY OF THIS CHARTER
PARTY, THE OWNERS SHALL PROCURE THAT BOTH THE VSL AND 'THE COMPANY' (AS
DEFINED BY THE ISM CODE) SHALL COMPLY WITH THE REQUIREMENTS OF ISM CODE.
UPON
REQUEST OWNERS SHALL PROVIDE A COPY OF RELEVANT DOCUMENT OF COMPLIANCE
(DOC)
AND SAFETY MANAGEMENT CERTIFICATE (SMC) TO THE CHRTRS.

22) REDELIVERY NOTICES
CHRTRS TO GIVE 14/10 DAYS APPROX AND 3/1 DAY DEFINITIVE NOTICES ON REDELIVERY.

23) EXTRA WAR RISKS CLAUSE
EXTRA WAR RISKS CLAUSE AS PER BPTIME 3 (CLAUSE 30) TO BE INCORPORATED IN THIS
CHARTER PARTY.
HULL AND MACHINERY VALUE USD 62.5 MIO

24) ADDRESS COMMISSION CLAUSE
1.25 PCT ADDRESS COMMISSION PAYBALE BY OWNERS ON HIRE FOR THIS AGREEMENT
AND
DEDUCTABLE AT SOURCE

25) CHARTER PARTY ADMINISTRATION CLAUSE
CHARTER PARTY TERMS AND CONDITIONS ARE EVIDENCED BY THE FIXING CONFIRMATION
TELEX/FAX/E-MAIL. EXCEPT IF REQUESTED IN WRITING BY EITHER OWNERS OR
CHARTERERS, THERE SHALL BE NOT PRODUCED FORMAL WRITTEN AND SIGNED CHARTER
PARTY. BOTH OWNERS AND CHARTERERS SHALL HAVE SIGNED RECAP AS EVIDENCE OF
FIXTURE

26) DRUG AND ALCOHOL ABUSE.
THE EXXON DRUG AND ALCOHOL POLICY, BLANKET DECLARATION IS TO BE DEEMED A
PART
OF THIS CHARTER PARTY. THE OWNER WARRANTS SUCH BLANKET DECLARATION IS
REGISTERED WITH EXXON. THE OWNER FURTHER WARRANTS THAT IT HAS AN ACTIVE
POLICY
ON DRUG AND ALCOHOL ABUSE, APPLICABLE TO THE VESSEL, IN FULL FORCE AT ALL
TIMES WHICH MEETS OR EXCEEDS THE STANDARDS SET DOWN IN THE OIL COMPANIES

INTERNATIONAL MARINE FORUM GUIDELINES FOR THE CONTROL OF DRUGS AND ALCOHOL
ONBOARD SHIP. THE POLICY WILL REMAIN IN EFFECT DURING THE TERM OF THIS CHARTER
AND WILL BE FULLY COMPLIED WITH AT ALL TIMES. THE CHARTERER IS NOT TO BE HELD
RESPONSIBLE FOR ANY AND ALL CONSEQUENCES OF THE OWNER FAILING TO COMPLY
WITH
THIS CLAUSE.

27) REMEASUREMENT - THE CHARTERER SHALL HAVE RIGHT TO REQUEST THE OWNERS
TO
REMEASURE THE VESSEL AND OWNERS WILL DO THEIR BEST ENDEAVOUR TO ARRANGE
FOR
SAME WITH THE HEADOWNERS.  ALL COSTS AND TIME USED FOR RE-MEASURING TO BE
FOR
CHARTERER'S ACCOUNT. CHARTERERS ARE AWARE THAT THE VESSEL DOES NOT HAVE
CERTIFICATION IN PLACE FOR DIFFERENT MEASURED DEADWEIGHTS.

28) BIMCO U.S. CUSTOMS ADVANCE NOTIFICATION / AMS CLAUSE


END RECAP

MANY THANKS
BEST REGARDS
VALERY ORLOV

# EXHIBIT 2

**Code word for this Charter Party**
**"SHELLTIME 4"**

*Issued December 1984*

# Time Charter Party

### LONDON,                    19

IT IS THIS DAY AGREED between                                                               1

of                          (hereinafter referred to as "Owners"), being owners of the    2
good                        vessel called                                                 3

(hereinafter referred to as "the vessel") described as per Clause 1 hereof and            4

of                          (hereinafter referred to as "Charterers"):                    5

| | | |
|---|---|---|
| **Description and Condition of Vessel** | 1. | At the date of delivery of the vessel under this charter — 6 |

    (a)  she shall be classed;                                                          7
    (b)  she shall be in every way fit to carry crude petroleum and/or its products;    8

    (c)  she shall be tight, staunch, strong, in good order and condition, and in every way fit for the    9
service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator    10
and radar) in a good and efficient state;    11
    (d)  her tanks, valves and pipelines shall be oil-tight;    12
    (e)  she shall be in every way fitted for burning    13

        at sea – fueloil with a maximum viscosity of          Centistokes at 50 degrees Centigrade/any    14
        *commercial grade of fueloil ("ACGFO") for main propulsion, marine diesel oil/ACGFO*    15
        *for auxiliaries*    16
        in port – marine diesel oil/ACGFO for auxiliaries;    17

    (f)  she shall comply with the regulations in force so as to enable her to pass through the Suez and    18
Panama Canals by day and night without delay;    19
    (g)  she shall have on board all certificates, documents and equipment required from time to time by    20
any applicable law to enable her to perform the charter service without delay;    21
    (h)  she shall comply with the description in Form B appended hereto, provided however that if there    22
is any conflict between the provisions of Form B and any other provision, including this Clause 1, of this charter    23
such other provision shall govern.    24

**Shipboard Personnel and their Duties**

2.  (a)  At the date of delivery of the vessel under this charter —    25
    (i)  she shall have a full and efficient complement of master, officers and crew for a vessel of her    26
tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be    27
trained to operate the vessel and her equipment competently and safely;    28
    (ii)  all shipboard personnel shall hold valid certificates of competence in accordance with the    29
requirements of the law of the flag state;    30
    (iii)  all shipboard personnel shall be trained in accordance with the relevant provisions of the    31
International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978;    32
    (iv)  there shall be on board sufficient personnel with a good working knowledge of the English    33
language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and    34
to enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be    35
carried out quickly and efficiently.    36
    (b)  Owners guarantee that throughout the charter service the master shall with the vessel's officers    37
and crew, unless otherwise ordered by Charterers,    38
    (i)  prosecute all voyages with the utmost despatch;    39
    (ii)  render all customary assistance; and    40
    (iii)  load and discharge cargo as rapidly as possible when required by Charterers or their agents    41
to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the    42
case may be) and in each case in accordance with any applicable laws of the flag state.    43

**Duty to Maintain**

3.  (i)  Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any    44
event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the    45
conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.    46
    (ii)  If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the    47
requirements of Clauses 1, 2(a) or 10 then *hire shall be reduced to the extent necessary to indemnify Charterers*    48
*for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services*    49
*under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time*    50
*so lost.*    51
    Any reduction of hire under this sub-Clause (ii) shall be without prejudice to any other remedy    52
available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded    53
from any calculation under Clause 24.    54
    (iii)  If Owners are in breach of their obligation under Clause 3(i) Charterers may so notify Owners in    55
writing; and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed    56
to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(i), the    57
vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they    58
are exercising such due diligence.    59
    Furthermore, at any time while the vessel is off-hire under this Clause 3 Charterers have the    60
option to terminate this charter by giving notice in writing with effect from the date on which such notice of    61
termination is received by Owners or from any later date stated in such notice. This sub-Clause (iii) is without    62
prejudice to any rights of Charterers or obligations of Owners under this charter or otherwise (including without    63
limitation Charterers' rights under Clause 21 hereof).    64

| | | |
|---|---|---|
| 'eriod Trading .imits | 4.   Owners agree to let and Charterers agree to hire the vessel for a period of commencing from the time and date of delivery of the vessel. for the purpose of carrying all lawful merchandise (subject always to Clause 28) including in particular | 65<br>66<br>67 |

in any part of the world. as Charterers shall direct. subject to the limits of the current British Institute Warranties and any subsequent amendments thereof. Notwithstanding the foregoing. but subject to Clause 35. Charterers may order the vessel to ice-bound waters or to any part of the world outside such limits provided that Owners consent thereto (such consent not to be unreasonably withheld) and that Charterers pay for any insurance premium required by the vessel's underwriters as a consequence of such order.    68 69 70 71 72
    Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places (which expression when used in this charter shall include ports. berths. wharves. docks. anchorages. submarine lines. alongside vessels or lighters. and other locations including locations at sea) where she can safely lie always afloat. Notwithstanding anything contained in this or any other clause of this charter. Charterers do not warrant the safety of any place to which they order the vessel and shall be under no liability in respect thereof except for loss or damage caused by their failure to exercise due diligence as aforesaid. Subject as above. the vessel shall be loaded and discharged at any places as Charterers may direct. provided that Charterers shall exercise due diligence to ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out in the latest published edition of the ICS/OCIMF Ship-to-Ship Transfer Guide.    73 74 75 76 77 78 79 80 81
    The vessel shall be delivered by Owners at a port in    82

at Owners' option and redelivered to Owners at a port in    83

at Charterers' option.    84

| Laydays/ Cancelling | 5.   The vessel shall not be delivered to Charterers before             and Charterers shall have the option of cancelling this charter if the vessel is not ready and at their disposal on or before | 85<br>86 |
| Owners to Provide | 6.   Owners undertake to provide and to pay for all provisions. wages. and shipping and discharging fees and all other expenses of the master, officers and crew; also, except as provided in Clauses 4 and 34 hereof. for all insurance on the vessel. for all deck. cabin and engine-room stores, and for water; for all drydocking. overhaul. maintenance and repairs to the vessel; and for all fumigation expenses and de-rat certificates. Owners' obligations under this Clause 6 extend to all liabilities for customs or import duties arising at any time during the *performance of this charter in relation to the personal effects of the master, officers and crew. and in relation to* the stores, provisions and other matters aforesaid which Owners are to provide and pay for and Owners shall refund to Charterers any sums Charterers or their agents may have paid or been compelled to pay in respect of any such liability. Any amounts allowable in general average for wages and provisions and stores shall be credited to Charterers insofar as such amounts are in respect of a period when the vessel is on-hire. | 87<br>88<br>89<br>90<br>91<br>92<br>93<br>94<br>95<br>96 |
| Charterers to Provide | 7.   Charterers shall provide and pay for all fuel (except fuel used for domestic services). towage and pilotage and shall pay agency fees. port charges. commissions. expenses of loading and unloading cargoes. canal dues and all charges other than those payable by Owners in accordance with Clause 6 hereof. provided that all charges for the said items shall be for Owners' account when such items are consumed. employed or incurred for Owners' purposes or while the vessel is off-hire (unless such items reasonably relate to any service given or distance made good and taken into account under Clause 21 or 22): and provided further that any fuel used in connection with a general average sacrifice or expenditure shall be paid for by Owners. | 97<br>98<br>99<br>100<br>101<br>102<br>103 |
| Rate of Hire | 8.   Subject as herein provided. Charterers shall pay for the use and hire of the vessel at the rate of       per day. and pro rata for any part of a day. from the time and date of her delivery (local time) until the time and date of her redelivery (local time) to Owners. | 104<br>105<br>106 |
| Payment of Hire | 9.   Subject to Clause 3 (iii). payment of hire shall be made in immediately available funds to: | 107 |

               Account    108
in            per calendar month in advance. less:    109
          (i)   any hire paid which Charterers reasonably estimate to relate to off-hire periods. and    110
          (ii)   any amounts disbursed *on Owners' behalf. any advances and commission thereon. and*    111
charges which are for Owners' account pursuant to any provision hereof. and    112
          (iii)   any amounts due or reasonably estimated to become due to Charterers under Clause 3 (ii) or    113
24 hereof.    114
any such adjustments to be made at the due date for the next monthly payment after the facts have been    115
ascertained. Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners'    116
account provided that Charterers have made proper and timely payment.    117
    In default of such proper and timely payment.    118
      (a)   Owners shall notify Charterers of such default and Charterers shall within seven days of receipt of    119
such notice pay to Owners the amount due including interest. failing which Owners may withdraw the vessel from    120
the service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise:    121
and    122
      (b)   Interest on any amount due but not paid on the due date  shall accrue from the day after that date    123
up to and including the day when payment is made. at a rate per annum which shall be 1% above the U.S. Prime    124
Interest Rate as published by the Chase Manhattan Bank in New York at 12.00 New York time on the due date .    125
or. if no such interest rate is published on that day. the interest rate published on the next preceding day on which    126
such a rate was so published. computed on the basis of a 360 day year of twelve 30-day months. compounded    127
semi-annually.    128

| | | |
|---|---|---|
| Space Available to Charterers | 10. The whole reach, burthen and decks of the vessel and any passenger accommodation (including Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed _____ tonnes at any time during the charter period. | 129 130 131 132 |
| Overtime | 11. Overtime pay of the master, officers and crew in accordance with ship's articles shall be for Charterers' account when incurred, as a result of complying with the request of Charterers or their agents, for loading, discharging, heating of cargo, bunkering or tank cleaning. | 133 134 135 |
| Instructions and Logs | 12. Charterers shall from time to time give the master all requisite instructions and sailing directions, and he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master. | 136 137 138 139 140 141 |
| Bills of Lading | 13. (a) The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading as Charterers or their agents may direct (subject always to Clauses 35(a) and 40) without prejudice to this charter. Charterers hereby indemnify Owners against all consequences or liabilities that may arise (i) from signing bills of lading in accordance with the directions of Charterers or their agents, to the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as provided in Clause 13(b)) from the master otherwise complying with Charterers' or their agents' orders; (ii) from any irregularities in papers supplied by Charterers or their agents. (b) Notwithstanding the foregoing, Owners shall not be obliged to comply with any orders from Charterers to discharge all or part of the cargo (i) at any place other than that shown on the bill of lading and/or (ii) without presentation of an original bill of lading unless they have received from Charterers both written confirmation of such orders and an indemnity in a form acceptable to Owners. | 142 143 144 145 146 147 148 149 150 151 152 153 154 155 |
| Conduct of Vessel's Personnel | 14. If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations to Charterers as soon as possible. | 156 157 158 159 |
| Bunkers at Delivery and Redelivery | 15. Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall on redelivery (whether it occurs at the end of the charter period or on the earlier termination of this charter) accept and pay for all bunkers remaining on board, at the then-current market prices at the port of delivery or redelivery, as the case may be, or if such prices are not available payment shall be at the then-current market prices at the nearest port at which such prices are available; provided that if delivery or redelivery does not take place in a port payment shall be at the price paid at the vessel's last port of bunkering before delivery or redelivery, as the case may be. Owners shall give Charterers the use and benefit of any fuel contracts they may have in force from time to time, if so required by Charterers, provided suppliers agree. | 160 161 162 163 164 165 166 167 |
| Stevedores, Pilots, Tugs | 16. Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact the servants of Charterers their agents or any affiliated company); provided, however, that (i) the foregoing indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and (ii) Charterers shall be liable for any damage to the vessel caused by or arising out of the use of stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefor from stevedores. | 168 169 170 171 172 173 174 175 176 177 178 179 |
| Supernumeraries | 17. Charterers may send representatives in the vessel's available accommodation upon any voyage made under this charter, Owners finding provisions and all requisites as supplied to officers, except liquors. Charterers paying at the rate of _____ per day for each representative while on board the vessel. | 180 181 182 |
| Sub-letting | 18. Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of this charter. | 183 184 |
| Final Voyage | 19. If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers may deduct amounts due or reasonably expected to become due for (i) disbursements on Owners' behalf or charges for Owners' account pursuant to any provision hereof, and (ii) bunkers on board at redelivery pursuant to Clause 15. Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made good by Charterers. If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or to complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be. | 185 186 187 188 189 190 191 192 193 194 195 196 197 |

| | |
|---|---|
| Loss of Vessel | 20.  Should the vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss; should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on which the vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, this charter shall terminate and hire shall cease at noon on the day on which she was last heard of. Any hire paid in advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last bunkering port. |

Off-hire

21.  (a)  On each and every occasion that there is loss of time (whether by way of interruption in the vessel's service or, from reduction in the vessel's performance, or in any other manner)

(i)  due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey; collision, stranding, accident or damage to the vessel; or any other similar cause preventing the efficient working of the vessel; and such loss continues for more than three consecutive hours (if resulting from interruption in the vessel's service) or cumulates to more than three hours (if resulting from partial loss of service); or

(ii)  due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the master, officers or crew; or

(iii)  for the purpose of obtaining medical advice or treatment for or landing any sick or injured person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the body of any person (other than a Charterers' representative), and such loss continues for more than three consecutive hours; or

(iv)  due to any delay in quarantine arising from the master, officers or crew having had communication with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the master, officers, or crew; or

(v)  due to detention of the vessel by authorities at home or abroad attributable to legal action against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or neglect of Charterers): then

without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder or otherwise the vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which such loss of time commenced; provided, however, that any service given or distance made good by the vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire.

(b)  If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel shall be off-hire under this Clause 21 shall be the difference between

(i)  the time the vessel would have required to perform the relevant service at such guaranteed speed, and

(ii)  the time actually taken to perform such service (including any loss of time arising from interruption in the performance of such service).

For the avoidance of doubt, all time included under (ii) above shall be excluded from any computation under Clause 24.

(c)  Further and without prejudice to the foregoing, in the event of the vessel deviating (which expression includes without limitation putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or purpose mentioned in Clause 21(a), the vessel shall be off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which the deviation commenced; provided, however, that any service given or distance made good by the vessel whilst so off-hire shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or purpose mentioned in Clause 21 (a), puts into any port other than the port to which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. Should the vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and payable during any time lost thereby.

(d)  If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such hostilities find it commercially impracticable to employ the vessel and have given Owners written notice thereof then from the date of receipt by Owners of such notice until the termination of such commercial impracticability the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account.

(e)  Time during which the vessel is off-hire under this charter shall count as part of the charter period.

Periodical Drydocking

22.  (a)  Owners have the right and obligation to drydock the vessel at regular intervals of         On each occasion Owners shall propose to Charterers a date on which they wish to drydock the vessel, not less than         before such date, and Charterers shall offer a port for such periodical drydocking and shall take all reasonable steps to make the vessel available as near to such date as practicable.

Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have the right to retain any monies received therefor, without prejudice to any claim for loss of cargo under any bill of lading or this charter.

(b)  If a periodical drydocking is carried out in the port offered by Charterers (which must have suitable accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall be off-hire from the time she arrives at such port until drydocking is completed and she is in every way ready to resume Charterers' service and is at the position at which she went off-hire or a position no less favourable to Charterers, whichever she first attains. However,

(i)  provided that Owners exercise due diligence in gas-freeing, any time lost in gas-freeing to the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, whether lost on passage to the drydocking port or after arrival there (notwithstanding Clause 21), and

198
199
200
201
202
203
204
205
206
207
208
209
210
211
212
213
214
215
216
217
218
219
220
221
222
223
224
225
226
227
228
229
230
231
232
233
234
235
236
237
238
239
240
241
242
243
244
245
246
247
248
249
250
251
252
253
254
255
256
257
258
259
260
261
262
263
264
265
266
267
268
269
270
271
272
273
274

(ii)    any additional time lost in further gas-freeing to meet the standard required for hot work or entry to cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there. 275
276

Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any calculation under Clause 24. 277
278

The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for Owners' account. 279
280

(c)    If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to proceed to the special port until she next presents for loading in accordance with Charterers' instructions, provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any benefit they may gain in purchasing bunkers at the special port. 281
282
283
284
285
286
287
288

(d)    Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of tank-cleaning necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which Charterers calculate to have been saved thereby, whether the vessel drydocks at an offered or a special port 289
290
291

Ship Inspection    23.    Charterers shall have the right at any time during the charter period to make such inspection of the vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in their absolute discretion may determine and whether the vessel is in port or on passage. Owners affording all necessary co-operation and accommodation on board provided, however, 292
293
294
295

(i)    that neither the exercise nor the non-exercise, nor anything done or not done in the exercise or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase Charterers' responsibilities to Owners or third parties for the same; and 296
297
298
299

(ii)    that Charterers shall not be liable for any act, neglect or default by themselves, their servants or agents in the exercise and non-exercise of said right. 300
301

Detailed Description and Performance    24.    (a)    Owners guarantee that the speed and consumption of the vessel shall be as follows:- 302

| Average speed in knots | Maximum average bunker consumption | |
|---|---|---|
| | main propulsion  –    auxiliaries | |
| | fuel oil/diesel oil    fuel oil/diesel oil | |
| Laden | tonnes    tonnes | |

303
304
305
306

Ballast 307

The foregoing bunker consumptions are for all purposes except cargo heating and tank cleaning and shall be pro-rated between the speeds shown. 308
309

The service speed of the vessel is    knots laden and    knots in ballast and in the absence of Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than one laden and one ballast speed are shown in the table above Charterers shall have the right to order the vessel to steam at any speed within the range set out in the table (the "ordered speed"). 310
311
312
313

If the vessel is ordered to proceed at any speed other than the highest speed shown in the table, and the average speed actually attained by the vessel during the currency of such order exceeds such ordered speed plus 0.5 knots (the "maximum recognised speed"), then for the purpose of calculating any increase or decrease of hire under this Clause 24 the maximum recognised speed shall be used in place of the average speed actually attained. 314
315
316
317
318

For the purposes of this charter the "guaranteed speed" at any time shall be the then–current ordered speed or the service speed, as the case may be 319
320

The average speeds and bunker consumptions shall for the purposes of this Clause 24 be calculated by reference to the observed distance from pilot station to pilot station on all sea passages during each period stipulated in Clause 24 (c), but excluding any time during which the vessel is (or but for Clause 22 (b) (i) would be) off-hire and also excluding "Adverse Weather Periods", being (i) any periods during which reduction of speed is necessary for safety in congested waters or in poor visibility (ii) any days, noon to noon, when winds exceed force 8 on the Beaufort Scale for more than 12 hours. 321
322
323
324
325
326

(b)  If during any year from the date on which the vessel enters service (anniversary to anniversary) the vessel falls below or exceeds the performance guaranteed in Clause 24(a) then if such shortfall or excess results | 327 328 329

(i)  from a reduction or an increase in the average speed of the vessel, compared to the speed guaranteed in Clause 24(a), then an amount equal to the value at the hire rate of the time so lost or gained, as the case may be, shall be deducted from or added to the hire paid; | 330 331 332

(ii)  from an increase or a decrease in the total bunkers consumed, compared to the total bunkers which would have been consumed had the vessel performed as guaranteed in Clause 24(a), an amount equivalent to the value of the additional bunkers consumed or the bunkers saved, as the case may be, based on the average price paid by Charterers for the vessel's bunkers in such period, shall be deducted from or added to the hire paid. | 333 334 335 336

The addition to or deduction from hire so calculated for laden and ballast mileage respectively shall be adjusted to take into account the mileage steamed in each such condition during Adverse Weather Periods, by dividing such addition or deduction by the number of miles over which the performance has been calculated and multiplying by the same number of miles plus the miles steamed during the Adverse Weather Periods, in order to establish the total addition to or deduction from hire to be made for such period. | 337 338 339 340 341

Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other remedy available to Charterers. | 342 343

(c)  Calculations under this Clause 24 shall be made for the yearly periods terminating on each successive anniversary of the date on which the vessel enters service, and for the period between the last such anniversary and the date of termination of this charter if less than a year. Claims in respect of reduction of hire arising under this Clause during the final year or part year of the charter period shall in the first instance be settled in accordance with Charterers' estimate made two months before the end of the charter period. Any necessary adjustment after this charter terminates shall be made by payment by Owners to Charterers or by Charterers to Owners as the case may require. | 344 345 346 347 348 349 350

Payments in respect of increase of hire arising under this Clause shall be made promptly after receipt by Charterers of all the information necessary to calculate such increase. | 351 352

**Salvage**  25.  Subject to the provisions of Clause 21 hereof, all loss of time and all expenses (excluding any damage to or loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of services rendered under this Clause 25. | 353 354 355 356 357

All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers after deducting the master's, officers' and crew's share. | 358 359

**Lien**  26.  Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any amounts due under this charter; and Charterers shall have a lien on the vessel for all monies paid in advance and not earned, and for all claims for damages arising from any breach by Owners of this charter. | 360 361 362

**Exceptions**  27.  (a)  The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the master, pilots, mariners or other servants of Owners in the navigation or management of the vessel; fire, unless caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion, bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery; provided, however, that Clauses 1, 2, 3 and 24 hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure in performance hereunder arising or resulting from act of God, act of war, seizure under legal process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotions or arrest or restraint of princes, rulers or people. | 363 364 365 366 367 368 369 370 371 372

(b)  The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress and to deviate for the purpose of saving life or property. | 373 374

(c)  Clause 27(a) shall not apply to or affect any liability of Owners or the vessel or any other relevant person in respect of | 375 376

(i)  loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, whether or not such works or equipment belong to Charterers, or | 377 378 379

(ii)  any claim (whether brought by Charterers or any other person) arising out of any loss of or damage to or in connection with cargo. All such claims shall be subject to the Hague-Visby Rules or the Hague Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant bill of lading (whether or not such Rules were so incorporated) or, if no such bill of lading is issued, to the Hague-Visby Rules. | 380 381 382 383 384

(d)  In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire. | 385 386

**Injurious Cargoes**  28.  No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such damage, shall be for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that would expose the vessel to capture or seizure by rulers or governments. | 387 388 389 390

**Grade of Bunkers**  29.  Charterers shall supply marine diesel oil/fuel oil with a maximum viscosity of            Centistokes at 50 degrees Centigrade/ACGFO for main propulsion and diesel oil/ACGFO for the auxiliaries. If Owners require the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost thereof. | 391 392 393

Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality complying with the International Marine Bunker Supply Terms and Conditions of Shell International Trading Company and with its specification for marine fuels as amended from time to time. | 394 395 396

**Disbursements**  30.  Should the master require advances for ordinary disbursements at any port, Charterers or their agents shall make such advances to him, in consideration of which Owners shall pay a commission of two and a half per cent, and all such advances and commission shall be deducted from hire. | 397 398 399

Laying-up     31.   Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the     400
vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be     401
adjusted to reflect any net increases in expenditure reasonably incurred or any net saving which should     402
reasonably be made by Owners as a result of such lay-up. Charterers may exercise the said option any number of     403
times during the charter period.     404

Requisition     32.   Should the vessel be requisitioned by any government, de facto or de jure, during the period of this     405
charter, the vessel shall be off-hire during the period of such requisition, and any hire paid by such government in     406
respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of     407
the charter period.     408

Outbreak of War     33.   If war or hostilities break out between any two or more of the following countries: U.S.A., U.S.S.R.,     409
P.R.C., U.K., Netherlands–both Owners and Charterers shall have the right to cancel this charter.     410

Additional War     34.   If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war,     411
Expenses     Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which     412
are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of     413
such expenses as soon as practicable and in any event before such expenses are incurred, and provided further     414
that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any     415
claims by Owners under their war risk insurance arising out of compliance with such orders.     416

War Risks     35.   (a)   The master shall not be required or bound to sign bills of lading for any place which in his or     417
Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade,     418
war, hostilities, warlike operations, civil war, civil commotions or revolutions.     419
          (b)   If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in     420
Clause 35(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach     421
or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter     422
(a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and     423
Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or     424
discharged, as the case may be, at any other place within the trading limits of this charter (provided such other     425
place is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been     426
received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at     427
liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in     428
their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due     429
fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.     430
          (c)   The vessel shall have liberty to comply with any directions or recommendations as to departure,     431
arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever     432
given by the government of the state under whose flag the vessel sails or any other government or local authority     433
or by any person or body acting or purporting to act as or with the authority of any such government or local     434
authority including any de facto government or local authority or by any person or body acting or purporting to     435
act as or with the authority of any such government or local authority or by any committee or person having under     436
the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by     437
reason of or in compliance with any such directions or recommendations anything is done or is not done, such     438
shall not be deemed a deviation.     439
          If by reason of or in compliance with any such direction or recommendation the vessel does not     440
proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed     441
to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part     442
of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners' obligations under this     443
charter so far as cargo so discharged is concerned.     444
          Charterers shall procure that all bills of lading issued under this charter shall contain the Chamber of     445
Shipping War Risks Clause 1952.     446

Both to Blame     36.   If the liability for any collision in which the vessel is involved while performing this charter falls to be     447
Collision Clause     determined in accordance with the laws of the United States of America, the following provision shall apply:     448
          "If the ship comes into collision with another ship as a result of the negligence of the other ship and any     449
act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the     450
management of the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or     451
liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or     452
damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying     453
ship or her owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying     454
ship or her owners as part of their claim against the carrying ship or carrier."     455
          "The foregoing provisions shall also apply where the owners, operators or those in charge of any ship     456
or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or     457
contact."     458
          Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the     459
foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be     460
determined in accordance with the laws of the United States of America.     461

New Jason     37.   General average contributions shall be payable according to the York/Antwerp Rules, 1974, and shall     462
Clause     be adjusted in London in accordance with English law and practice but should adjustment be made in accordance     463
with the law and practice of the United States of America, the following provision shall apply:     464
          "In the event of accident, danger, damage or disaster before or after the commencement of the     465
voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the     466
consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers,     467
consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any     468
sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and     469
special charges incurred in respect of the cargo."     470
          "If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said     471
salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover     472

the estimated contribution of the cargo and any salvage and special charges thereon shall. if required. be made by   473
the cargo. shippers. consignees or owners of the cargo to the carrier before delivery."   474
      Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the   475
foregoing terms. to be applicable where adjustment of general average is made in accordance with the laws and   476
practice of the United States of America.   477

**Clause Paramount**

    38.   Charterers shall procure that all bills of lading issued pursuant to this charter shall contain the   478
following clause:   479
      "(1) Subject to sub-clause (2) hereof. this bill of lading shall be governed by. and have effect subject   480
to. the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of   481
Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed   482
at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be   483
deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his   484
*responsibilities or liabilities under the Hague-Visby Rules.*"   485
      "(2) If there is governing legislation which applies the Hague Rules compulsorily to this bill of lading.   486
to the exclusion of the Hague-Visby Rules. then this bill of lading shall have effect subject to the Hague Rules.   487
Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities   488
*or an increase of any of his responsibilities or liabilities under the Hague Rules.*"   489
      "(3) If any term of this bill of lading is repugnant to the Hague-Visby Rules. or Hague Rules if   490
applicable. such term shall be void to that extent but no further."   491
      "(4) Nothing in this bill of lading shall be construed as in any way restricting. excluding or waiving the   492
right of any relevant party or person to limit his liability under any available legislation and/or law."   493

**TOVALOP**

    39.   Owners warrant that the vessel is:   494
    (i)   a tanker in TOVALOP and   495
    (ii)  properly entered in                            P & I Club   496

and will so remain during the currency of this charter.   497
    When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution   498
Damage. or when there is the threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the   499
escape or discharge of Oil which. if it occurred. would create a serious danger of Pollution Damage. whether or   500
not an escape or discharge in fact subsequently occurs). then Charterers may. at their option. upon notice to   501
Owners or master. undertake such measures as are reasonably necessary to prevent or minimise such Pollution   502
Damage or to remove the Threat. unless Owners promptly undertake the same. Charterers shall keep Owners   503
*advised of the nature and result of any such measures taken by them and. if time permits. the nature of the*   504
*measures intended to be taken by them.* Any of the aforementioned measures taken by Charterers shall be   505
deemed taken on Owners' authority as Owners' agent. and shall be at Owners' expense except to the extent that:   506
      (1)  any such escape or discharge or Threat was caused or contributed to by Charterers. or   507
      (2)  by reason of the exceptions set out in Article III. paragraph 2. of the 1969 International   508
Convention on Civil Liability for Oil Pollution Damage. Owners are or. had the said Convention applied to such   509
escape or discharge or to the Threat. would have been exempt from liability for the same. or   510
      (3)  the cost of such measures together with all other liabilities. costs and expenses of Owners arising   511
out of or in connection with such escape or discharge or Threat exceeds one hundred and sixty United States   512
Dollars (US $160) per ton of the vessel's Tonnage or sixteen million eight hundred thousand United States   513
Dollars (US $16.800.000). whichever is the lesser. save and insofar as Owners shall be entitled to recover such   514
excess under either the 1971 International Convention on the Establishment of an International Fund for   515
Compensation for Oil Pollution Damage or under CRISTAL:   516
      PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures   517
should be discontinued. Owners shall so notify Charterers and thereafter Charterers shall have no right to   518
continue said measures under the provisions of this Clause 39 and all further liability to Charterers under this   519
Clause 39 shall thereupon cease.   520
    The above provisions are not in derogation of such other rights as Charterers or Owners may have   521
under this charter or may otherwise have or acquire by law or any International Convention or TOVALOP.   522
    The term "TOVALOP" means the Tanker Owners' Voluntary Agreement Concerning Liability   523
for Oil Pollution dated 7th January 1969. as amended from time to time. and the term "CRISTAL" means the   524
Contract Regarding an Interim Supplement to Tanker Liability for Oil Pollution dated 14th January 1971. as   525
amended from time to time. The terms "Oil". "Pollution Damage". and "Tonnage" shall for the purposes of this   526
Clause 39 have the meanings ascribed to them in TOVALOP.   527

**Export Restrictions**

    40.   The master shall not be required or bound to sign bills of lading for the carriage of cargo to any place to   528
which export of such cargo is prohibited under the laws. rules or regulations of the country in which the cargo was   529
produced and/or shipped.   530
    Charterers shall procure that all bills of lading issued under this charter shall contain the following   531
clause:   532
      "If any laws rules or regulations applied by the government of the country in which the cargo was   533
produced and/or shipped. or any relevant agency thereof. impose a prohibition on export of the cargo   534
to the place of discharge designated in or ordered under this bill of lading. carriers shall be entitled to   535
require cargo owners forthwith to nominate an alternative discharge place for the discharge of the   536
cargo. or such part of it as may be affected. which alternative place shall not be subject to the   537
prohibition. and carriers shall be entitled to accept orders from cargo owners to proceed to and   538
discharge at such alternative place. If cargo owners fail to nominate an alternative place within 72   539
hours after they or their agents have received from carriers notice of such prohibition. carriers shall be   540
*at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place*   541
*on which they or the master may in their or his absolute discretion decide and which is not subject to the*   542
prohibition. and such discharge shall constitute due performance of the contract contained in this bill   543
of lading so far as the cargo so discharged is concerned".   544
    The foregoing provision shall apply mutatis mutandis to this charter. the references to a bill of lading   545
being deemed to be references to this charter.   546

| | | |
|---|---|---|
| Law and<br>Litigation | 41.  (a)  This charter shall be construed and the relations between the parties determined in accordance with the laws of England. | 547<br>548 |
| | (b)  Any dispute arising under this charter shall be decided by the English Courts to whose jurisdiction the parties hereby agree. | 549<br>550 |
| | (c)  Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect to have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being in force. | 551<br>552<br>553<br>554<br>555 |

<div style="margin-left:2em">

(i)  A party shall lose its right to make such an election only if:    556

    (a)  it receives from the other party a written notice of dispute which –    557

      (1)  states expressly that a dispute has arisen out of this charter;    558

      (2)  specifies the nature of the dispute; and    559

      (3)  refers expressly to this clause 41(c)    560

    and    561

    (b)  it fails to give notice of election to have the dispute referred to arbitration not later than 30 days from the date of receipt of such notice of dispute.    562, 563

(ii)  The parties hereby agree that either party may –    564

    (a)  appeal to the High Court on any question of law arising out of an award;    565

    (b)  apply to the High Court for an order that the arbitrator state the reasons for his award;    566

    (c)  give notice to the arbitrator that a reasoned award is required; and    567

    (d)  apply to the High Court to determine any question of law arising in the course of the reference.    568, 569

</div>

| | | |
|---|---|---|
| | (d)  It shall be a condition precedent to the right of any party to a stay of any legal proceedings in which maritime property has been, or may be, arrested in connection with a dispute under this charter, that that party furnishes to the other party security to which that other party would have been entitled in such legal proceedings in the absence of a stay. | 570<br>571<br>572<br>573 |
| Construction | 42.  The side headings have been included in this charter for convenience of reference and shall in no way affect the construction hereof. | 574<br>575 |

# EXHIBIT 3

## LBK SHIPPING LTD. ( BRITISH VIRGIN ISLANDS)

Akaru Bldg. 24 De Castro Street, Wickhams Cay 1, Road Town, Tortola
tel.+7812 495 41 37; fax. +7812 495 41 36; tel. +358 207 11 88 60; fax. +358 207 11 88 69
www.lbkshipping.com; E-mail: lbkshipp@sp.ru

| INVOICE: | 237/08/01 |
|---|---|
| Date: | 23.04.2008 |
| CHARTERERS: | FR8 Singapore Pte Ltd |

m/t Mare Pacific
C/P Date:   08.08.07

|  | Debit USD | Credit USD |
|---|---|---|
| Final hire from   18.03.2008 20:55     LT | | |
| till     17.04.2008 20:55     LT | | |
| 30.00   days  at   USD      27 100.00 PDPR | 813 000,00 | |
| Commission to FR8 Services Pte Ltd                    1.25% | | 10 162,50 |
| Off-hire  from   22.03.2008 10:30     LT | | |
| till     17.04.2008 20:55     LT | | |
| 26.43   days  at   USD      27 100.00 PDPR | | 716 362,15 |
| Commission to FR8 Services Pte Ltd                    1.25% | 8 954,53 | |
| Owners expenses at call to Haldia | | 26,25 |
| Owners expenses at various ports | | 21 049,40 |
| US Tanker Voyage Surcharge for 3rd quarter 2007 | 18 760,80 | |
| Bunker expenses | | |
| HSFO:   547.300    mt  X   USD       495.00     pmt | | 270 913,50 |
| LSFO:    80.200    mt  X   USD       495.00     pmt | | 39 699,00 |
| MGO:     2.300    mt  X   USD       992.50     pmt | 2 282,75 | |
| Hire payment 18/03/08-22/03/08 | | 93 141,22 |
| Hire payment 22/03/08-17/04/08 | | 695 459,33 |
| **TOTAL TO CHRTRS ACCOUNT:** | | 1003 815,28 |



On behalf of RITONA OIL LTD.
Capt. Sergey Dozhdev
Managing director of LBK Shipping Ltd.

# EXHIBIT 4

## Marner, Keri

| | |
|---|---|
| **From:** | Nurulhuda Yusoff [Nurulhuda@fr8.com] |
| **Sent:** | 02 May 2008 06:54 |
| **To:** | 'Perehost' |
| **Cc:** | post-fixtures |
| **Subject:** | RE: Re[2]: FW: FW: Re[8]: MT MARE PACIFIC / FR8 SINGAPORE - TCP 08.08.07 - redelivery notice 5 |

**Importance:** High

Hello Olga,
Further to Owners message below, Charterers confirm acceptance of Owner's final invoice of US$1,003,815.28 .
Kindly revert owners confirmation and value date of payment for above amount. Many thanks!
Warmest regards,
Noura / FR8 Singapore

**From:** Perehost [mailto:bvi@lbkshipping.com]
**Sent:** Tuesday, 29 April, 2008 2:28 PM
**To:** Nurulhuda Yusoff
**Subject:** Re[2]: FW: FW: Re[8]: MT MARE PACIFIC / FR8 SINGAPORE - TCP 08.08.07 - redelivery notice 4

```
Hello Noura,

Please confirm that CHRTRS accept our final hire invoice amounting to USD 1.003.815,28.
It is definitive and to the further discussion is not subject.

Best Regards,
Olga Khoreva


Monday, April 28, 2008, 1:06:55 PM, you wrote:
```

> Good day Olga,
  **Without Prejudice**
  Charterers await for Owners prompt remittance of USD1,003,815.28 as per last. Owners confirmation for the above much appreciated.
  **Warmest regards**
  *Noura Yusoff*
  *FR8 Singapore Pte Ltd*
  Dir: +65 6826 0887
  Fax: +65 6826 0890
  email : nurulhuda@FR8.com
          post-fixtures@FR8.com


  **From:** Perehost [mailto:bvi@lbkshipping.com]
  **Sent:** Friday, 25 April, 2008 9:57 PM
  **To:** Nurulhuda Yusoff
  **Subject:** Re: FW: FW: Re[8]: MT MARE PACIFIC / FR8 SINGAPORE - TCP 08.08.07 - redelivery notice 3

```
Good day Noura,

Thanks for your below.

Using bunkering prices on 22.03.08 was agreed and confirmed by you in message
21/04/08.

According to C/P cls 15
QTE
```

13/05/2008

... as the case may be, or if such prices are not available payment shall be at then current
market prices at the nearest port at which such prices are available...
UNQTE
that's why Hong Kong prices were used.

Due to 22.03.08 was Saturday we used prices on last nearest working day 20/03/08.

Your request to remit usd 1.003.815,28 will be settled only after your confirmation and
approval our last invoice.

Your kind confirmation above would be appreciated.

Best Regards,
Olga Khoreva


Friday, April 25, 2008, 11:46:53 AM, you wrote:

> Good day Olga,

  Please find Charterers comments below :-

  **Without Prejudice**

  Charterers thank Owners hire statement using bunker prices at Hong Kong on 20th March 2008 rather than prices at Guangzhou on 2nd April as per Charter Party.

  Kindly remit the funds of US$1,003,815.28 as per your statement at your earliest convenience.

  Charterers are also attaching their final redelivery invoice basis bunker prices at Guangzhou for Owners reference.

  Charterers reserve their right under the TCP to revisit the disputed redelivery bunker prices.
  Appreciate Owners understanding and confirmation of the above. Charterers require payment details once above done. Pleased to hear.
  Warmest regards
  Noura Yusoff
  *FR8 Singapore Pte Ltd*
  Dir: +65 6826 0887
  Fax: +65 6826 0890
  email : nurulhuda@FR8.com

  **From:** Perehost [mailto:bvi@lbkshipping.com]
  **Sent:** Wednesday, 23 April, 2008 8:33 PM
  **To:** Nurulhuda Yusoff
  **Subject:** Re: FW: Re[8]: MT MARE PACIFIC / FR8 SINGAPORE - TCP 08.08.07 - redelivery notice 2


  ATTN: Noura

  Good day,

  Please find attached statement.
  Awaiting your confirmation/comments.

  Best Regards,
  Olga Khoreva


  Tuesday, April 22, 2008, 1:29:59 PM, you wrote:

  > Hi Olga,
    Charterers awaiting news from Owners. Please advise status.
    Warmest regards,
    Noura / FR8 Singapore

**From:** Nurulhuda Yusoff
**Sent:** Monday, 21 April, 2008 1:14 PM
**To:** 'Perehost'
**Cc:** Graeme McNaught; Esther Lee; Narendran Padmalayam
**Subject:** RE: Re[8]: MT MARE PACIFIC / FR8 SINGAPORE - TCP 08.08.07 - redelivery notice 2

Hello Olga,

Many thanks owners last which Charterers have safely received, Having gone through the SOA, charterers reject the bunker prices stated on the SOA as they are last bunker prices, which interestingly Charterers used to calculate bunkers with in the very first hire statement.

As per telcon with Owners last Friday, even though Charterers do not agree with Owners taking prices on 22 march 2008 ,as it is not redelivery date,
we would readily consider prices on that day since vessel started her offhire from that day onwards.

From Owners last correspondences with the old management , we managed to get bunkers on delivery & prices that was supposedly to be paid. Please find the mail attached.

IFO   : 380.80 mt x USD 320.00 pmt = US$121,856.00
MDO  :  34.80mt x USD 542.00 pmt = US$ 18,861.00

Since Owners require "official documentation" with regards to the current bunker prices, Charterers will leave it to Owner's to find out from their bunker contacts in the market for them. alternatively, Should Owners require Charterers help of finding same, please let us know. Kindly confirm receipt and understanding of above.

**Warmest regards,**
**Noura / FR8 Singapore**



**From:** Perehost [mailto:bvi@lbkshipping.com]
**Sent:** Wednesday, 16 April, 2008 10:45 PM
**To:** Nurulhuda Yusoff
**Subject:** Re[8]: MT MARE PACIFIC / FR8 SINGAPORE - TCP 08.08.07 - redelivery notice 2

Good day Noura,

I repeat part of my yesterday message regarding bunkering:

Vessel was delivered to CHRTRS on 18.10.06 21:35 LT at port La
Libertad/Ecuador
according Charter Party dated 15.08.06 with bunker ROB IFO: 380.8 mt, MDO
34.8 mt
Bunker ROB was not paid by CHRTRS on delivery.

As per your below vessel was re-delivered to Owner with bunker ROB: HSFO:
928.100 MT,
LSFO: 80.200 MT, MGO: 32.500 MT

Please note from C/P:

QTE

CLS 15 - DELETE AND INSERT
NO PAYMENT FOR BUNKERS ON DELIVERY.
**DIFFERENCE IN VALUE OF BUNKERS ON DELIVERY/REDELIVERY** SHALL BE COMPENSATED
IN ACCORDANCE
WITH PRICES ESTABLISHED IN ACCORDANCE WITH PRINTED CLS.15 OF THIS C/P.

UNQTE

Calculation of bunker to be paid on re-delivery according to above:

HSFO :  928.100 MT - 380.800 MT = 547.300 MT
LSFO :   80.200 MT -   0.000 MT =  80.200 MT
MGO  :   32.500 MT -  34.800 MT = - 2.300 MT

Regarding above please find attached final hire statement.



13/05/2008

Awaiting your soonest confirmation.

Best Regards,
Olga Khoreva

_____ Information from ESET NOD32 Antivirus, version of virus signature database 3041 (20080419) _____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com

--
Best regards,
  Perehost                    mailto:bvi@lbkshipping.com

_____ Information from ESET NOD32 Antivirus, version of virus signature database 3041 (20080419) _____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com

--
Best regards,
  Perehost                    mailto:bvi@lbkshipping.com

_____ Information from ESET NOD32 Antivirus, version of virus signature database 3041 (20080419) _____

The message was checked by ESET NOD32 Antivirus.

http://www.eset.com

--
Best regards,
  Perehost                    mailto:bvi@lbkshipping.com

**EXHIBIT 5**

About Us  Range Of Services | Main Trades | Fleet List

**Fleet List**

**About Ritona Oil Ltd.**



Vessel name: **m.t. "Ance"**

Blt: **2006**
DWT: **52622**



Vessel name: **m.t. "Indra"**

Blt: **1994**
DWT: **33115**



Vessel name: **m.t. "Jurkalne"**

Blt: **2006**
DWT: **51800**



Vessel name: **m.t. "Kraslava"**

Blt: **2007**
DWT: **37258**



Vessel name: **m.t. "Kuldiga"**

Blt: **2002**
DWT: **52622**



Vessel name: **m.t. "Mari Atlantic"**

Blt: **2001**
DWT: **68467**



Ritona Oil Ltd is a worldwide c
specializing in intra-regional a
trades.

The primary trading areas of t
are Canada , North, South and
the Caribbean and the Transa

read more







Vessel name: **m.t. "Targale"**

Blt: **2007**
DWT: **52660**



Vessel name: **m.t. "Mari Pacific"**

Blt: **2001**
DWT: **68467**



Vessel name: **m.t. "Zoja I"**

Blt: **1988**
DWT: **28557**



Vessel name: **m.t. "Estere"**

Blt: **1989**
DWT: **28610**



Vessel name: **m.t. "Ugale"**

Blt: **2006**
DWT: **52642**

Copyright © RITONA OIL LTD. Design & Production © 2007 All Rights Reserved.



**LBK SHIPPING LTD. (BRITISH VIRC**



About us

Contacts

Map

News

Fleet

- Brokerage
- Agency
- Insurance
- Ship finance
- Operating
- Technical
  service

**DWT: >28,000 mt**

Estere
Indra
Zoja I

**DWT: 37,258 mt**
Kuldiga
Kandava
Kazdanga
Kraslava
Kristjanis Valdemars

**DWT: 51,800 mt**
Ance
Jurkalne
Piltene
Puze
Targale
Ugale
Usma
Uzava

**DWT: 68,467 mt**

Mare Atlantic
Mare Pacific